HOWARD J. KLEIN (NO. 77029)
hjklein@koslaw.com
THEODORE P. LOPEZ (NO. 191328)
tlopez@koslaw.com
SANG N. DANG (NO. 214558)
sdang@koslaw.com
**KLEIN, O'NEILL & SINGH, LLP**
43 Corporate Park
Suite 204
Irvine, CA 92606
Telephone: 949-955-1920
Facsimile: 949-955-1921

Attorneys for Defendant,
THE REPUBLICAN NATIONAL COMMITTEE

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION – LOS ANGELES

| | |
|---|---|
| JACKSON BROWNE, an individual<br><br>        Plaintiff,<br><br>    vs.<br><br>JOHN MCCAIN, an individual; THE REPUBLICAN NATIONAL COMMITTEE, a non-profit political organization; THE OHIO REPUBLICAN PARTY; a non-profit political organization,<br><br>        Defendants. | CASE NO. CV08-05334 RGK (Ex)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTHE NATIONAL REPUBLICAN COMMITTEE'S SPECIAL MOTION TO STRIKE UNDER C.C.P. § 425.16**<br><br><u>Hearing</u><br>Date: December 8, 2008<br>Time: 9:00 a.m.<br>Place: Courtroom 850<br>Judge: Hon. R. Gary Klausner |

Dockets.Justia.com

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................1

II.  STATEMENT OF FACTS .....................................................................................2

III.  BROWNE'S COMMON LAW RIGHT OF PUBLICITY CLAIM MUST BE
STRICKEN UNDER THE STATUTE .........................................................................7

   A.  THE CLAIM ARISES OUT OF POLITICAL SPEECH THAT IS A MATTER OF PUBLIC
INTEREST AND CONCERN. .........................................................................................9

   B.  BROWNE CANNOT MEET HIS BURDEN TO DEMONSTRATE A PROBABILITY HE
WILL PREVAIL ON HIS RIGHT OF PUBLICITY CLAIM. ..................................................11

     1.  Browne's Right Of Publicity Claim Fails Because The Political Video Is
Non-Commercial Speech That Relates To A Matter Of Public Interest ...............11

     2.  The Political Video Is Subject To Full And Stringent Protection Under The
First Amendment. ................................................................................................15

     3.  The Transformative Nature Of The Use In The Political Video Precludes
Liability. ..............................................................................................................17

IV.  CONCLUSION...................................................................................................19

i

# TABLE OF AUTHORITIES

## FEDERAL CASES

*American Family Life Insurance Co. v. Hagan*, 266 F. Supp. 2d 682 (N.D. Ohio 2002) ------------------------------------------------------------------------------ 12

*Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003) -------------------------------------7

*Bridges v. California*, 314 U.S. 252 (1941)------------------------------------------------ 10

*Buckley v. Valeo*, 424 U.S. 1 (1976) --------------------------------------------------- 15, 16

*Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118 (N.D. Cal. 2002) ----------------------- 13, 17

*Fed. Election Com'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431 (2001) ------------------------------------------------------------------------------------ 12

*Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136 (S.D. Cal. 2005) ------- 8, 9

*Friends of Phil Gramm v. Americans for Phil Gramm In '84*, 587 F. Supp. 769 (E.D.Va. 1984)---------------------------------------------------------------------------- 13, 19

*Geary v. Renne*, 880 F. 2d 1062 (9th Cir. 1989) ----------------------------------------- 15

*Geary v. Renne*, 880 F. 2d 1062, 1065 (9th Cir. 1989)----------------------------------- 16

*Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001) ------------------ 12

*Linmark Assocs., Inc. v. Twp. Of Willingboro*, 431 U.S. 85 (1977) -----------------------6

*Mastercard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, 2004 U.S. Dist. LEXIS 3644 (S.D.N.Y. 2004) ------------------------------------------------------------------ 12

*Mills v. Alabama*, 384 U.S. 214 (1966)--------------------------------------------------- 16

*Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971)------------------------------------------ 16

*National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ----------------------- 15

*New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302 (9th Cir. 1992) -12, 13, 15

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ---------------------------------- 16

*Roth v. United States*, 354 U.S. 476 (1957)------------------------------------------------ 16

*Sammartano v. First Judicial District Court for the County of Carson City*, 303 F. 3d 959 (9th Cir. 2002) ------------------------------------------------------------- 16

STATE CASES

*Beilenson v. Sup. Ct.*, 44 Cal. App. 4th 944 (1996) ---------------------------------9, 10, 19

*Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628 (1996) --------------------8

*City of Cotati v. Cashman*, 29 Cal. 4th 69 (2002) ----------------------------------------8

*Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387 (2001) - 12, 15, 17, 18

*Cox v. Hatch*, 761 P. 2d 556 (Utah 1988) ---------------------------------------- 14, 19

*Davis v. Duryea*, 99 Misc. 2d 933, 417 N.Y.S. 2d 624 (1979) ---------------------- 14, 15

*Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53 (2002)-------------- 7, 8, 9

*Gates v. Discovery Communications, Inc.*, 34 Cal. 4th 679 (2004)------------------------8

*Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 3d 860 (1979) ------------------ 17

*Ingels v. Westwood One Broadcasting Services, Inc.*, 129 Cal. App. 4th 1050 (2005) - 8

*Kirby v. Sega of America, Inc.*, 144 Cal. App. 4th 47 (2006)---------------------------- 18

*M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623 (2001) --------------------------------8

*Macias v. Hartwell*, 55 Cal. App. 4th 669 (1997)--------------------------------------------9

*Maheu v. CBS, Inc.*, 201 Cal. App. 3d 662 (1988) -------------------------------------- 13

*Matson v. Dvorak*, 40 Cal. App. 4th 539 (1995) --------------------------------------------9

*Mowles v. Commission of Governmental Ethics and Election Practices*, --- A.2d ---, 2008 Me. LEXIS 165 (Me. 2008) -----------------------------------------------------------6

*Paulsen v. Personality Posters, Inc.*, 299 N.Y.S.2d 501 (N.Y.Sup. 1968) 11, 13, 14, 15

*Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318 (1997) ------- 11

*Robertson v. Rodriguez*, 36 Cal. App. 4th 347 (1995)---------------------------------------9

*Rosenaur v. Scherer*, 88 Cal. App. 4th 260 (2001) -------------------------------------- 10

*Rusheen v. Cohen*, 37 Cal. 4th 1048 (2006) ----------------------------------------------8

iii

*Slauson Partnership v. Ochoa*, 112 Cal. App. 4th 1005 (2003)--------------------------8

*Varian Medical Systems, Inc. v. Delfino*, 35 Cal. 4th 180 (2005)------------------------9

*Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811 (2002) ------------------------8, 9

*Winter v. DC Comics*, 30 Cal.4th 881 (2003)------------------------------------------ 17

## STATUTES

California Civil Code § 3344(d)-------------------------------------------------------- 13

California Code of Civil Procedure § 425.16-------------------------------------------1, 7, 9

iv

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Political speech is the cornerstone of American democracy and political campaigns are the focus and fountain of society's political discourse. Campaign messages by political parties and other political speakers educate and inform the public and stimulate debate about the most important topics in a democracy: those who seek to govern and the policies they will pursue. For these reasons, the U.S. Supreme Court has made clear that political speech, including campaign-related and generated speech, receives the highest level of protection under the First Amendment. In the hierarchy of protected speech, political speech stands at the pinnacle.

In this action, Jackson Browne ("Browne") takes aim at such political speech by suing over a video (the "Political Video") produced and disseminated by the Ohio Republican Party ("ORP") about the energy plans espoused by Senator Barack Obama ("Obama") and Senator John McCain ("McCain").[1] This Political Video commented on Obama's statement that substantial energy savings could be met through proper tire inflation and used a snippet of Browne's song *Running On Empty* (the "Song") – including only nine seconds of Browne's voice from the Song – to criticize Obama as "running on empty" when it comes to energy policy. Use of that phrase in the debate about energy policy is nothing new: it was a staple of political discourse long before the Political Video.

Browne's effort to punish those who engage in such political speech is precisely the kind of action California Code of Civil Procedure § 425.16 (the "Statute") was designed to stop. Browne's California common law right of publicity claim is subject to dismissal under the Statute because the speech that is the basis for that claim concerns matters of the utmost public interest: the policies of the candidates running for the President of the United States. Thus, Browne's right of publicity claim is within

---

[1] McCain has been sued only in his personal, individual capacity.

the purview of the first prong of the Statute, which shifts the burden to Browne to prove there is a probability he will prevail on the merits of his claim. Because Browne cannot meet that burden, his right of publicity claim must be stricken.

## II. STATEMENT OF FACTS

Browne is a "world-renowned singer and songwriter" known for his "politically and socially charged songs." Docket No. 1, Complaint ("Compl.") ¶ 14. In 1977, he released an album entitled *Running on Empty*, which contained the Song of the same name. Over the years, Browne has purportedly supported various Democratic and liberal causes and publicly supported Obama's presidential campaign. Compl. ¶ 15. This lawsuit stems from Browne's objection to use of portions of the Song in a political message created to comment on Obama's campaign and energy policy.

Throughout the 2008 election campaign, the ORP utilized web videos primarily to generate news coverage in Ohio about the candidates and issues in the campaign. *See* Declaration of John McClelland ("McClelland Decl.") concurrently-filed in connection with Defendant ORP's Motion to Dismiss, ¶ 5. The purpose of these web videos was to generate media attention on important political issues; they were not used as a fundraising tool or to solicit contributions. *Id.* Beginning on or about July 25, 2008, in preparation for Obama's scheduled visit to Ohio during the week of August 4, 2008, the ORP created a web video to criticize and comment on Obama's energy strategy. This Political Video is referenced in paragraph 2 of the Complaint.

The Political Video is one minute and twenty seconds long. It starts with clips from local Ohio television news broadcasts in which reporters discuss the "pain at the pump," *i.e.*, high gasoline prices. One reporter asks "How do you bring down the price of gas here in northeast Ohio and across the U.S.A.?" and the Political Video then cuts to a clip of Obama saying at a rally "making sure your tires are properly inflated." The sound of a needle being dragged across a record is then heard as the screen flashes the word "What!?!" The Political Video then shows information about McCain's energy plans and clips of McCain speaking at a political rally in which he states that low-

income Americans are bearing the brunt of a failed energy policy. The Political Video then shows a screen that poses the question: "What's that Obama plan again?" At this point, 50 seconds into the Political Video, music (but no lyrics) from the Song is first heard in the background. The Political Video then shows Obama stating that "we can save all the oil they're talking about getting off drilling if everyone was just inflating their tires." Senator Hillary Clinton is then shown saying (at a press conference during a time when she was also a candidate for the President of the United States), "Shame on you, Barack Obama." A picture of Obama then appears next to the caption "Barack Obama: No Solutions" and the words "No Solutions" change to the words "Not Ready to Lead." This screen with the picture and words appears at 1:11 into the Political Video, and at this point the sound of Browne singing the lyrics "running on empty" along with a few other words that bracket that phrase in the Song can be heard. The Political Video ends with a screen stating as follows: "Paid for by the Ohio Republican Party. www.ohiogop.org. Not authorized by any candidate or candidate committee." Thus, Browne's voice (*i.e.*, Browne singing the Song) is heard for **nine** seconds at the end of the Political Video. McClelland Decl., ¶ 10.

Obama's suggestion about proper tire inflation is used in the Political Video to convey the message that Obama's energy strategy was no strategy at all, *i.e.*, that it was "empty" of substance. The ORP communications staffer who created the Political Video believed that referencing the lyric "running on empty" helped convey this message, which was particularly relevant during a time of rising gasoline prices and heightened concern about dependency on foreign oil. McClelland Decl., ¶ 9.

Well before the creation of the Political Video, the phrase "running on empty" had become part of the common political vernacular in discussing energy policy. *See* Declaration of Lincoln D. Bandlow ("Bandlow Decl.") concurrently-filed in connection with Defendant McCain's Motion to Strike Under C.C.P. § 425.16, ¶ 2, Ex. 5. Indeed, politicians from both sides of the aisle regularly used the phrase to describe the oppositions' energy policies:

3

- On June 11, 2008, Democratic Senator Klobuchar said at a press conference that Republicans were "running on empty" with "the same old ideas" about energy policy. Bandlow Decl., ¶ 3, Ex. 6.
- On June 16, 2008, Republican Senator Inhofe published an article in HUMAN EVENTS titled "Dems Running On Empty." Bandlow Decl., ¶ 4, Ex. 7.
- On June 17, 2008, the Senate Republican Policy Committee issued a policy statement titled "Running On Empty: Why the Democrats' Energy Bill Won't Lower Prices at the Pump." Bandlow Decl., ¶ 5, Ex. 8.
- On June 30, 2008, President Bush publicly remarked that Democrats were against measures that would "lower prices at the pump" and thus "[y]ou might say, when it comes to energy policy, the Democrats in Congress are running on empty." Bandlow Decl., ¶ 6, Ex. 9.
- On July 31, 2008, a Colorado Democrat commented in a press release that McCain lacked "an energy plan for the future of our country" and "his campaign is running on empty." Bandlow Decl., ¶ 7, Ex. 10.

Moreover, for years prior to the Political Video, journalists and commentators had utilized the phrase "running on empty" to discuss energy policy and issues:

- A January 31, 2002 article by U.S. PIRG about subsidies to energy industries was titled "Running On Empty: How Environmentally Harmful Energy Subsidies Siphon Billions From Taxpayers." Bandlow Decl., ¶ 8, Ex. 11.
- A March 12, 2005 article in the NEW YORK TIMES about skyrocketing costs of energy was titled "Running On Empty." Bandlow Decl., ¶ 9, Ex. 12.

4

- An April 2006 article by the Federal Reserve Bank of Dallas about rising oil prices and oil depletion was titled "Running on Empty? How Economic Freedom Affects Oil Supplies." Bandlow Decl., ¶ 10, Ex. 13.
- A July 3, 2006 article from IN THESE TIMES about rising gasoline prices was titled "Running On Empty: The United States' real problem with oil and energy policy goes beyond the rising prices." Bandlow Decl., ¶ 11, Ex. 14.
- A June 27, 2007 article in MOTHER JONES about passage of a Senate energy bill was titled "Running On Empty." Bandlow Decl., ¶ 12, Ex. 15.
- A March 22, 2007 article in INVESTOR'S BUSINESS DAILY about energy policy was titled "Running On Empty." Bandlow Decl., ¶ 13, Ex. 16.
- A March 23, 2008 article from REAL CLEAR POLITICS about Democrats blaming the rise in oil prices on the war in Iraq was titled "Running On Empty." Bandlow Decl., ¶ 14, Ex. 17.
- An April 24, 2008 article in THE NATION about oil reserves was titled "Running On Empty." Bandlow Decl., ¶ 15, Ex. 18.
- An April 27, 2008 article in THE ROCKY MOUNTAIN NEWS about gasoline supply was titled "Denver Running On Empty." Bandlow Decl., ¶ 16, Ex. 19.
- A June 23, 2008 article in the WEEKLY STANDARD was titled "Running on Empty: Democratic energy policies ignore reality." Bandlow Decl., ¶ 17, Ex. 20.

Thus, the cliché "running on empty" has long been used as a metaphor for a lack of substance, ideas or solutions, particularly in the arena of energy policy. The Political Video was simply one of many such examples.

5

On August 4, 2008, an ORP communications staffer posted the Political Video to the free YouTube website, using ORP's account. McClelland Decl., ¶ 12. The ORP did not pay to have the Political Video run as a political advertisement on any television station or website and the Political Video did not include any solicitations for donations. *Id.* at ¶¶ 22-23. On August 6, 2008, promptly after Browne complained, the ORP removed the Political Video from YouTube and the Political Video has not been used since that time. *Id.* at ¶ 24.

Notwithstanding the fact that the Political Video indicates that it was created solely by the ORP and was removed from circulation only days after it was posted (and immediately after Browne's request that it be taken down from YouTube), on August 14 Browne filed this action, playing politics of his own by naming not only the ORP, but the Republican National Committee and McCain as defendants. Browne then leveraged the attention and notoriety generated by filing an action against a candidate for President of the United States to enable Browne to hit the "campaign" trail as well – the campaign to promote Browne and his new album "Time The Conqueror." Since filing this action, Browne has appeared on numerous television programs (such as The Colbert Report and The Tonight Show with Jay Leno) and has given numerous interviews, discussing this action and his new album. Bandlow Decl., ¶¶ 18-19, Exs. 21-22. Thus, Browne's conduct evidences an important aspect of First Amendment jurisprudence: the answer to speech one disagrees with is simply more speech, not resort to legal action. *Mowles v. Commission of Governmental Ethics and Election Practices*, --- A.2d ---, 2008 Me. LEXIS 165, *16 (Me. 2008) (the "appropriate cure" for allegedly misleading political speech is more speech) (citing *Linmark Assocs., Inc. v. Twp. Of Willingboro*, 431 U.S. 85, 97 (1977)). Unfortunately, engaging in such

6

1 additional speech was not enough for Browne, and so he pursues this action to punish
2 political speakers. His right of publicity claim cannot withstand a motion to strike.[2]

## III. BROWNE'S COMMON LAW RIGHT OF PUBLICITY CLAIM MUST BE STRICKEN UNDER THE STATUTE

The Statute establishes a special procedure for striking claims, at the very outset of litigation, that impinge upon rights of free speech:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of . . . free speech under the United States or California constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

C.C.P. § 425.16 (b)(1).[3]

The Statute "encourage[s] continued participation in matters of public significance" by limiting "lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech." *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal. 4th 53, 59-60 & n.3 (2002); *Batzel v. Smith*, 333 F.3d 1018, 1025 (9th Cir. 2003) (Statute protects defendant from "having to litigate meritless cases aimed at chilling First Amendment expression"). The Statute is to be construed broadly and a court may strike "unsubstantiated causes of action arising from protected speech" without regard to proof of whether plaintiff holds a subjective "intent to chill speech." *Equilon,* 29 Cal. 4th at 60.

_____

[2] Moreover, Browne's copyright infringement, vicarious copyright infringement and Lanham Act claims also fail, as set forth in the concurrently-filed Motion to Dismiss.

[3] Although the Statute is part of the California Code of Civil Procedure, a defendant may file an anti-SLAPP motion against pendent state law claims asserted in a federal lawsuit, and the federal court must apply the Statute. *See, e.g., U.S. ex rel Newsham v. Lockheed Missiles & Space Co., Inc.*, 190 F.3d 963, 970-73 (9th Cir. 1999).

7

The Statute contains no "limiting language" that would restrict its protection to certain claims. *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 642 (1996). "[T]he Legislature did not limit application of the provision[,] . . . recognizing that all kinds of claims could achieve the objective of a SLAPP suit – to interfere with and burden the defendant's exercise of his or her rights." *Id*. at 652. "[T]he critical point is whether the plaintiff's cause of action itself was based on an act in furtherance of the defendant's right of petition or free speech." *City of Cotati v. Cashman*, 29 Cal. 4th 69, 78 (2002). Accordingly, the Statute is not limited to defamation claims, but applies to privacy and publicity claims arising from conduct in the exercise of free speech rights. *See, e.g., Gates v. Discovery Communications, Inc.*, 34 Cal. 4th 679, 696 (2004) (applying Statute to right of privacy claim); *M.G. v. Time Warner, Inc.*, 89 Cal. App. 4th 623, 630 (2001) (applying Statute to "misappropriation of identity" claim).

In ruling on an anti-SLAPP motion, the court must engage in a two-step process. *Rusheen v. Cohen,* 37 Cal. 4th 1048, 1056 (2006). First, the court decides whether the defendant has made a *prima facie* showing that the challenged claim is one arising from an act in furtherance of the "right of petition or free speech under the United States or California Constitution in connection with a public issue. *Id.*; *Slauson Partnership v. Ochoa*, 112 Cal. App. 4th 1005, 1019-1020 (2003); *Ingels v. Westwood One Broadcasting Services, Inc.*, 129 Cal. App. 4th 1050, 1059 (2005).

Once a defendant has made its threshold showing that the plaintiff's claim arises from conduct constituting free speech on a public issue, the burden shifts to the plaintiff to demonstrate a reasonable probability of prevailing on the claim. *Rusheen*, 37 Cal. 4th at 1056; *Equilon*, 29 Cal. 4th at 65. To make such a showing, the plaintiff "must 'state[] and substantiate[] a legally sufficient claim.'" *Wilson v. Parker, Covert & Chidester*, 28 Cal. 4th 811, 821 (2002) (citations omitted); *Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1148 (S.D. Cal. 2005) (same). Thus, a motion

8

under the Statute establishes a procedure where the trial court evaluates the merits of the lawsuit using a summary judgment-like procedure. *Varian Medical Systems, Inc. v. Delfino*, 35 Cal. 4th 180, 192 (2005); C.C.P. § 425.16(b)(2) (in ruling on a motion under the Statute, "the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based"). The Court "should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim." *Wilson*, 28 Cal. 4th at 821; *Four Navy Seals*, 413 F. Supp. 2d at 1150.

Here, Browne's fourth claim for relief under California's common law right of publicity[4] is based on McCain's speech in connection with issues of public interest. Therefore, the claim falls within the ambit of the Statute and the burden shifts to Browne to demonstrate a probability of success on his claim. If this burden cannot be satisfied, the claim must be stricken. *Equilon*, 29 Cal. 4th at 67; C.C.P. § 425.16(b)(1). Browne cannot satisfy that burden.

**A.  The Claim Arises Out Of Political Speech That Is A Matter Of Public Interest And Concern.**

The Statute is routinely applied to political speech, in particular speech involving a political campaign. *Macias v. Hartwell*, 55 Cal. App. 4th 669, 672 (1997) (Statute "applies to suits involving statements made during a political campaign"); *Beilenson v. Sup. Ct.*, 44 Cal. App. 4th 944, 950 (1996) (holding that "[t]here is nothing in the language of section 425.16 that denies its use by politicians" and thus Statute applied to a campaign mailer); *Robertson v. Rodriguez,* 36 Cal. App. 4th 347, 352 (1995) (statements made in a campaign mailer in connection with a recall election are subject to Statute); *Matson v. Dvorak,* 40 Cal. App. 4th 539, 547 (1995)

---

[4] Browne did not sue under California's right of publicity statute, Civil Code § 3344, for the obvious reasons that the statute expressly exempts from liability any claim based on the use of a voice "in any political campaign." Cal. Civ. Code § 3344(d).

(statements made in a political flyer concerning a candidate are subject to Statute).
Thus, **it is "well settled that section 425.16 applies to actions arising from statements made in political campaigns by politicians and their supporters**."
*Rosenaur v. Scherer*, 88 Cal. App. 4th 260, 273 (2001) (emphasis added).

In *Beilenson*, the court specifically noted political speech must be given "wide latitude" in order to protect the right to free expression:

> [P]olitical campaigns are one of the most exhilarating phenomena of our democracy. They bring out the best and the worst in us. They allow candidates and their supporters to express the most noble, and lamentably, the most vile sentiments. They can be fractious and unruly, but what they yield is invaluable: an opportunity to criticize and comment upon government and the issues of the day.

*Id*. at 954-55. Thus, "'it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.'" *Id*. at 951; *quoting Bridges v. California*, 314 U.S. 252, 270-71 (1941).

In this case, there can be no question that Browne's fourth claim for relief arises out of speech in connection with a matter of public interest. The claim is based solely on the contents of the Political Video created in connection with the 2008 Presidential campaign to comment on the candidates for President of the United States. Compl. ¶ 2 (Political Video "mocks the suggestion of the presumptive Democratic candidate for President, Senator Barack Obama, that the country can conserve gasoline by keeping their automobile tires inflated to the proper pressure") and ¶ 40 (right of publicity claim is based on "use of Browne's voice" in the Political Video). Having injected himself into the public arena through his (constitutionally protected) political advocacy, Browne cannot now use the courts to silence those who reference this advocacy to make competing political points. As a New York court recognized thirty years ago, when a "well-known entertainer" delves into the arena of presidential

politics, "it is clearly newsworthy and of public interest." *Paulsen v. Personality Posters, Inc.*, 299 N.Y.S.2d 501, 507 (N.Y.Sup. 1968).

No one can dispute that the candidates and their campaigns for the Presidency are matters of the utmost public interest affecting the public at large. The Political Video directly commented on the Presidential candidates and their respective positions on a key national policy issue: energy and dependence on foreign oil. The Political Video questioned the substance and seriousness of Obama's energy plan while touting the plans of McCain. At the time the Political Video was posted on YouTube, rapidly rising gas prices and dependence on foreign oil were at the forefront of the campaign and were topics of great public concern. *See e.g.*, Bandlow Decl., ¶ 2, Ex. 5. Thus, the Political Video addressed issues of tremendous public interest and concern.

**B.    Browne Cannot Meet His Burden To Demonstrate A Probability He Will Prevail On His Right Of Publicity Claim.**

Because the claim arises out of speech relating to a matter of public concern, the first prong of the Statute is met and the burden shifts to Browne to demonstrate there is a likelihood he will prevail on the claim. He cannot meet that burden because his claim fails for a variety of reasons.

*1.    Browne's Right Of Publicity Claim Fails Because The Political Video Is Non-Commercial Speech That Relates To A Matter Of Public Interest*

Browne's right of publicity claim must be dismissed because such a claim only applies to commercial speech – which the Political Video clearly is not. Expressive, noncommercial speech about matters of public concern is simply not subject to a right of publicity claim. In California, a plaintiff such as Browne who alleges a common law claim for right of publicity must "establish a direct connection between the use of [his] name or likeness and a ***commercial*** purpose." *Polydoros v. Twentieth Century Fox Film Corp.*, 67 Cal. App. 4th 318, 322 (1997). In this context, commercial speech is

11

limited to that which "does no more than propose a commercial transaction" such as advertisements, endorsements and commercials. *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001) (citation omitted); *Comedy III Productions, Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 396 (2001) (Three Stooges drawings on t-shirts not commercial speech because they were not "advertisements for or endorsement of a product"). Because a right of publicity claim applies solely to such commercial speech, an "informative or cultural" use is "immune" from misappropriation liability. *See e.g., New Kids on the Block v. News America Publ'g, Inc.*, 971 F.2d 302, 309 (9th Cir. 1992).

Here, the Political Video did not propose a commercial transaction, and it was not an advertisement for or endorsement of a product. Nor did the Political Video solicit funds on behalf of any candidate or political cause. Indeed, even if the Political Video *had* solicited funds for a candidate or cause, the law would still consider it non-commercial. In *American Family Life Insurance Co. v. Hagan*, 266 F. Supp. 2d 682 (N.D. Ohio 2002), the court noted that speech used during a political campaign, including speech utilized for the "solicitation of contributions … is much more than merely a commercial transaction. ***Indeed, this exchange is properly classified not as a commercial transaction at all, but completely noncommercial, political speech***." *Id.* at 697 (emphasis added) (citing *Fed. Election Com'n v. Colorado Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001) ("Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association")); *Mastercard Int'l Inc. v. Nader 2000 Primary Comm., Inc.*, 2004 U.S. Dist. LEXIS 3644, *23-24 (S.D.N.Y. 2004) ("[e]ven assuming the [candidate's] ad 'commercial.' If so … all political campaign speech would also be 'commercial speech' since all political candidates collect contributions").

Indeed, it has been recognized that "[a]n organization cannot effectively exercise its right to advocate the election or defeat of a candidate unless it is also able to raise money for its cause." *Friends of Phil Gramm v. Americans for Phil Gramm In '84*, 587 F. Supp. 769, 774-75 (E.D.Va. 1984). In *Phil Gramm*, an official campaign committee of a candidate for the United States Senate brought an action against an independent political action committee to prevent it from using the candidate's name in its solicitations. The court rejected the request for a preliminary injunction on the grounds that it would "unduly interfere with defendants First Amendment right." *Id.* at 778. The court further found that "the interest in protecting the commercial value of a person's name does not apply in this type of case," because any economic interest a person may have in their identity "cannot justify restrictions on[] this type of preeminently political speech." *Id.* at 776.

Not only is a non-commercial use not subject to liability, but a claim under California's common law right of publicity is defeated "where the publication or dissemination of matters is 'in the public interest.'" *Daly v. Viacom, Inc.*, 238 F. Supp. 2d 1118, 1122 (N.D. Cal. 2002). The public interest defense to a right of publicity claim is a "complete" defense and provides "extra breathing space" even beyond the First Amendment. *New Kids,* 971 F.2d at 309-10; *Maheu v. CBS, Inc.*, 201 Cal. App. 3d 662, 676-77 (1988) (affirming dismissal on demurrer of right of publicity claims based on public interest test); *Paulsen*, 299 N.Y.S.2d at 506 (right of publicity claim by celebrity running mock Presidential campaign barred by public interest exception, court held that "[t]he scope of the subject matter which may be considered of 'public interest' or newsworthy has been defined in most liberal and far reaching terms"). Indeed, the California Legislature recognized these First-Amendment-mandated protections by incorporating them into exemptions to California's statutory right of publicity claim. *See* California Civil Code § 3344(d) (exempting claims stemming

from use in any "news, public affairs, or sports broadcast or account, or any political campaign"); *Cox v. Hatch*, 761 P. 2d 556, 560 (Utah 1988) (court found the use by Senator Orin Hatch of Utah of a photograph of post office employees without permission in campaign materials was permissible because "[c]ommunications to voters by an elected official or candidate for public office which appropriately pertain to a political campaign are a matter of public interest…[s]uch communications are essential to the public in choosing governmental officials and…in informing the public"); *Davis v. Duryea*, 99 Misc. 2d 933, 939, 417 N.Y.S. 2d 624, 628 (1979) ("any political candidate must be capable of discussing and attempting to document the validity of a position on a public election without fear of being subjected to a warrantless suit," to do otherwise would be "destructive of the essence of the freedom of positional or ideological exchange which is vital to the existence of a democratic electoral process"); *Paulsen*, 299 N.Y.S.2d at 505 ("troublesome confrontations with constitutionally protected areas of speech and press have also caused our courts to engraft exceptions and restrictions" onto the right of publicity to "avoid any conflict with the free dissemination of thoughts, ideas, newsworthy events, and matters of public interest"). As addressed below, political speech is afforded the highest protection under the First Amendment in large part because it is a matter of utmost public interest and importance.

Here, the Political Video and its commentary on the candidates for the Presidency certainly qualify as a matter of "public interest." The public interest inherent in the qualifications, policies and political beliefs of the candidates for the presidency of the United States is obvious. Moreover, the energy policy of the next President of the United States will affect every American and an open debate about the merits of those potential policies is of the utmost importance. Browne's voice (as he sings his familiar and cliché line "running on empty") played an important role in the

14

commentary on those policies. The public's familiarity with that line was an important tool to make a complicated message accessible to the public. *Comedy III*, 25.Cal.4th at 397 (when celebrities become "an important part of our public vocabulary," appropriating their idiom can have "important uses in uninhibited debate on public issues"); *Paulsen*, 299 N.Y.S.2d at 509 (noting that entertainers "actively seek[] to promote and stimulate such public attention to enhance [their] professional standing"). Use of Browne's voice in the Political Video to engage in important political speech certainly qualifies as a matter of public interest. The protection for such speech is "complete." *New Kids,* 971 F.2d at 309-10. Browne's interest in seeking an economic windfall for the use of his voice is trumped by this non-commercial, public interest political speech. *Davis*, 99 Misc. 2d at 936 ("privacy rights may not vitiate or abridge the paramount rights of society to information and necessary free expression in preparing for the exercise of the electoral franchise"); *Paulsen*, 299 N.Y.S.2d at 507-09 (use of a person's identity in connection with a matter of public interest "is constitutionally protected and must supersede any private pecuniary considerations"). Accordingly, Browne's fourth claim fails as a matter of law.

### 2. The Political Video Is Subject To Full And Stringent Protection Under The First Amendment.

"Political expression, in general, and speech uttered during a campaign for political office, in particular, enjoys the broadest protection of the First Amendment." *Geary v. Renne*, 880 F. 2d 1062, 1065 (9th Cir. 1989) (citing *Buckley v. Valeo*, 424 U.S. 1, 14 (1976)). Thus, because political speech is the "primary concern of the First Amendment," it is stringently protected. *National Endowment for the Arts v. Finley*, 524 U.S. 569, 597 (1998) (Scalia, J., concurring). Public discussion and debate on the qualifications and position of political candidates are integral to the operation of the system of government established by the United States Constitution. *Buckley*, 424 U.S.

at 14 (invalidating provisions of the Federal Election Campaign Act limiting certain campaign expenditures as violating candidates' and individuals' rights to freedom of speech). Political expression serves the public interest by assuring the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957).

The public interest in the protection of political speech extends to discussion of candidates for public office and their campaigns. *Mills v. Alabama*, 384 U.S. 214, 218 (1966) ("there is practically universal agreement that a major purpose of that [First] Amendment was to protect the free discussion of governmental affairs. . . . of course includ(ing) discussions of candidates"); *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971) ("it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office"); *Buckley*, 424 U.S. at 14-15 ("[i]n a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation"). This protection of political speech reflects the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964); *Sammartano v. First Judicial District Court for the County of Carson City*, 303 F. 3d 959, 974 (9th Cir. 2002) (the public interest is better served by "protecting the core First Amendment right of political expression") (citation omitted); *Geary v. Renne*, 880 F. 2d 1062, 1065 (9th Cir. 1989) ("any interference with the freedom of a [political] party is simultaneously an interference with the freedom of its adherents") (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 250 (1957)).

The Political Video is easily recognizable as fully protected political expression. It is an obvious political commentary on the relative strengths of two Presidential

16

candidates' energy plans and whether the candidates are qualified to serve in the highest office in the country and perhaps the most powerful position in the world. This is the paradigm for the kind of speech the First Amendment was intended to protect. Thus, the Political Video is entitled to the full protection of the First Amendment of the United States Constitution, which bars Browne's claim.

 *3.* **The Transformative Nature Of The Use In The Political Video Precludes Liability.**

 The California Supreme Court has long recognized that the right of publicity "has not been held to outweigh the value of free expression." *Guglielmi v. Spelling-Goldberg Productions*, 25 Cal. 3d 860, 872 (1979) (Bird, C.J. concurring) [5] (affirming the dismissal of right of publicity claim at demurrer stage on free speech grounds); *Daly*, 238 F. Supp. 2d at 1123 (dismissing common law right of publicity claim against expressive work as being barred by the First Amendment). "Any other conclusion," warned Chief Justice Bird, "would allow reports and commentaries on the thoughts and conduct of public and prominent persons to be subject to censorship under the guise of preventing the dissipation of the publicity value of a person's identity." *Guglielmi*, 25 Cal.3d at 872; *Comedy III*, 25 Cal. 4th at 403.

 Thus, to safeguard free expression, the California Supreme Court devised the "transformative use" test to determine if a work is shielded against a right of publicity claim by the First Amendment. *Comedy III*, 25 Cal. 4th at 405; *Winter v. DC Comics*, 30 Cal.4th 881 (2003). Borrowing from the fair use test in copyright law, the Court held that "when a work contains significant transformative elements," the use is protected under the First Amendment. *Comedy III*, 25 Cal. 4th at 405. Indeed, such a transformative work is "not only especially worthy of First Amendment protection, but

---

[5] Although a concurring opinion, "Chief Justice Bird's views in *Guglielmi* commanded the support of the majority of the court." *Comedy III*, 25 Cal. 4th at 396 n.7.

1  it is also less likely to interfere with the economic interest protected by the right of

2  publicity." *Id*. Under this test, the expressive and transformative use of Browne's voice

3  in the Political Video outweighs Browne's publicity rights.

4        Because the works and expressions of public figures and entertainers such as

5  Browne "take on public meaning" and become part of our common vernacular, the use

6  of celebrity indicia and a celebrity's signature expressions become important "in

7  uninhibited debate on public issues." *Comedy III*, 25 Cal. 4th at 397. Speakers,

8  particularly political speakers, must have liberty to make reference to these celebrity-

9  infused expression and imagery to express common understanding – just as the

10  Political Video has done here: using a familiar expression in a familiar song to convey

11  an important message. That the message was political in nature weighs more heavily in

12  favor of protecting the speech.

13        Thus, a work that transforms the celebrity's identity and/or manipulates the

14  context in which the celebrity's identity normally appears will be considered

15  transformative, fully protected under the First Amendment and immune from right of

16  publicity liability. *Comedy III,* 25 Cal. 4th at 408-409; *Kirby v. Sega of America, Inc.*,

17  144 Cal. App. 4th 47, 59 (2006) (right of publicity and Lanham Act claims by

18  celebrity lead singer of group "Deee-Lite" against maker of videogame that allegedly

19  contained character based on plaintiff barred by First Amendment because of changes

20  in characteristics and setting were transformative and "added creative elements to

21  create new expression"); *Comedy III*, 25 Cal. 4th at 408-09 (stating that celebrity

22  images presented through the use of "distortion and the careful manipulation of

23  context" that make an "ironic social comment on the dehumanization of celebrity

24  itself" are entitled to First Amendment protection).

25        The use in the Political Video of nine seconds of Browne's voice singing the

26  words "running on empty" was inserting it into an entirely new and different context

27

28

18

than the Song *per se*, and is undoubtedly transformative. The combination of the unexpected use of a rock song combined with a manipulation of the message of the Song is neither the same traditional use of the Song, nor an acceptable substitute for the Song's conventional full length version. The Political Video transforms the Song from an anthem for the rock-and-roll lifestyle into a scathing commentary on Obama's energy plan. Browne cannot use the courts to block all uses of his voice and image when used to comment on an important political situation by invoking the right of publicity. Accordingly, his claim must fail.

## IV.  CONCLUSION

Although the right of free speech guaranteed by the First Amendment serves a multitude of important individual and societal purposes, its most safeguarded function is to serve as a bulwark of self-governance:

> Our form of democratic government is dependent upon the unfettered exchange of information. … The '[p]reservation of free expression is of particular urgency in the political arena, since it is universally agreed that a major purpose of the First Amendment is to ensure vigorous, uninhibited discussion of governmental affairs.'

*Beilenson*, 44 Cal. App. 4th at 956 (citations omitted); *Cox*, 761 P.2d at 558 ("Freedom of speech is not only the hallmark of a free people, but is, indeed, an essential attribute of the sovereignty of citizenship"). Our society cannot effectively pursue and achieve such self-governance without the unfettered right and ability to comment on and engage in a robust debate about those who seek to govern us. *Friends of Phil Gramm*, 587 F. Supp. at 775 ("Advocacy of particular candidates for public office is essential to effective self government").

It is inevitable (and desirable) in such a debate that celebrities and the phrases they have infused into our lexicon become fodder for such commentary. Allowing

celebrities a civil action veto over this vital area of public discourse is not tolerated by California's anti-SLAPP statute or the First Amendment. *Id.* (holding that "SLAPP lawsuits stifle free speech" and the "threat of a SLAPP action brings a disquieting stillness to the sound and fury of legitimate political debate" and thus such a lawsuit "has no place in our courts").

Accordingly, for the reasons set forth above and in the concurrently-filed Motion To Dismiss, the RNC respectfully requests that the Court grant the Special Motion to Strike Under C.C.P. § 425.16 and strike Browne's fourth claim for common law misappropriation of right of publicity.[6]


DATED: November 17, 2008       KLEIN, O'NEILL & SINGH, LLP


                              By /s/ Howard J. Klein
                                 Howard J. Klein

                                 Attorneys for Defendant,
                                 THE REPUBLICAN NATIONAL
                                 COMMITTEE

---

[6] Moreover, under C.C.P. § 425.16(c), should the RNC prevail on this motion, the RNC will be entitled to recover attorney's fees and costs and will seek such amounts in a separately filed motion.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 17, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of the filing to all counsel of record.

         /s/ Sang N. Dang        
Sang N. Dang
